## WILEY W. PRIDGEN v. THE STATE.

Article 612 of the Penal Code reads as follows: "Where a defendant accused of murder seeks to justify himself on the ground of threats against his own life, he may be permitted to introduce evidence of the threats made, but the same shall not be regarded as affording a justification for the offense, unless it be shown that at the time of the homicide the person killed by some act then done manifested an intention to execute the threat so made. In every instance where proof of threats has been made it shall be competent to introduce evidence of the general character of the deceased. Such evidence shall extend only to an inquiry as to whether the deceased was a man of violent or dangerous character, or a man of kind and inoffensive disposition, or whether he was such a person as might reasonably be expected to execute a threat made." (Paschal's Dig., Art. 2270, Note 672.) The court below *held*, that there must be a predicate proved, which establishes that at the time of the homicide the deceased must have done some act manifesting an intention to carry the supposed threats into execution, and that such acts were questions of law for the court, and not of fact for the jury. This was error.

Whether or not there be any evidence is a question for the judge; its sufficiency for the purpose relied on is for the jury.

The whole object of proving threats is to ascertain the mind of the prisoner at the very moment of the commission of the homicide; every circumstance which tends to prove this is important, because a murder is a matter of intent, and cannot exist without malice.

Whether or not the threats are sufficient to establish reasonable fear is a question for the jury. (Rector v. The People, 19 Wend., 589; Howell v. Georgia, 5 Ga., 54.)

To explain the circumstances which surround the parties it would seem that things antecedent may be proved.

In civil cases the court may review the whole record and affirm the judgment if the whole facts warrant it; but in criminal cases the denial of any legal right is sufficient cause of reversal.

The effect of the ruling in this case was to say that the circumstances surrounding the parties developed on the trial were not sufficient to extenuate or justify notwithstanding the threats. But this was a question of fact for the jury, to be responded to under the charge of the court.

All we decide is, that under the circumstances the appellant was entitled to evidence of threats against himself by the deceased, and whether there were any acts done by the deceased at the time of the killing which extenuate or justify is a question of fact for the jury; and it follows as a sequence that the character of the deceased may be proved. (Paschal's Dig., Art. 2270.)

LINDSAY, J., dissented. He insisted that article 2270 introduced no new rule of evidence, but that if the threats can be established it makes the homicide justifiable, whereas at common law it was manslaughter.

The judge is the exclusive judge as to the admissibility of evidence. In criminal cases the jury are the exclusive judges of the facts, but not of the law. (Paschal's Dig., Art. 3058.)

Under article 2270 the accused may prove threats. The language is not imperative. When the evidence is admitted, the jury must determine whether the threats were made, and were they communicated to the prisoner. But before they are admitted the court must determine whether, in view of all the acts done at the time of the homicide, there were facts which superinduced the legal necessity or judicial propriety of permitting the accused to introduce proof of threats.

Justification is a deduction of law from the facts. Threats alone cannot constitute it. And there could be no justification, unless the deceased, at the time of the homicide, was manifesting, by a positive act then done, an intention to execute the threats.

This court should not for light cause revise the judicial discretion of the inferior court.

APPEAL from Victoria. The case was tried before Hon. WESLEY OGDEN, one of the district judges.

The value of the precedent in this case must depend upon the facts proved at the trial. Several witnesses were present at the tragedy. Some were sworn for the prisoner and some for the state. Yet there was such near agreement as rarely occurs. The killing was at the store of Henry F. Spear, at the Missouri Valley post office, in Victoria county, on the 12th October, 1867. The deceased,

Cornelius Pridgen, and the witness, Daniel Weiseger, were sitting at the store-house door of Spear, when the accused, Pridgen, and Spear rode up and saluted them with usual politeness. Brown did not return the salutation. Pridgen entered the store and sat down in a chair. Brown entered by another door and took a seat upon the counter. Both were armed with six-shooters. Brown asked Pridgen if he had found his horse. Pridgen said that he had not. Brown said, "He is in your brother's field." Pridgen then said, "I think it was unkind and ungenerous in you to employ the young man Thompson. He had previously been in my employment, and I was on his bail bond, and could at any time deliver him up." Brown replied that he supposed Thompson was a free man, and seemed to deny any knowledge of the suretyship. And here Brown complained that Pridgen had accused him with being concerned with Thompson in stealing the horse. This Pridgen denied, and demanded Brown's authority for the accusation. Brown pointed to the witness, Weiseger. Weiseger, being appealed to by Pridgen, stated what he had told Brown, and who was his author. Pridgen concluded the conversation by saying, "I do not care for you," at the same time rising from his chair. To which Brown instantly replied, "No, and nobody cares for you," as he descended from the counter. No other words were spoken, except the remark by Pridgen, "Do you draw your six-shooter?" or, "Don't draw your six-shooter." About the same moment Pridgen fired, and immediately followed it by another shot. Both shots took effect. Brown fell and died almost immediately. His pistol was found girded on behind him. It had not been removed from the scabbard. One witness saw Brown during the dialogue put his hand behind him, as if to adjust his pistol; another witness thought the pistol impeded Brown's descent from the counter, though Pridgen did not fire until he had descended to his feet and taken one step forward. Pridgen had the advantage

of having his pistol drawn when he first got upon his feet, or about the same time. Another witness swore positively that Brown made no attempt to draw his pistol, but had his hands at his side when he got upon his feet and until he was shot.

The whole dialogue was an angry conversation, (though one witness swore to Pridgen's coolness until he rose from his chair,) and when Pridgen said, "I don't care for you," or, "I don't care who said it," as others had it, he was much excited.   There was evidence that when Brown descended from the counter he took one step forward.

Upon this state of the evidence and at different periods Pridgen offered evidence that Brown had the day previous and two other days before threatened his life, and that he was a dangerous man, likely to execute his threats.   The court excluded this evidence, on the ground that no sufficient basis for this proof had been laid.   The court added that he was the judge of the circumstances at the time of the killing, and therefore of the admissibility of the evidence.   The court charged three degrees of felonious homicide, much in the language of the statute.   (Paschal's Dig., Arts. 2251, 2252, 2266, 2267, Notes 670, 671, 672.) And he refused all charges of excusable homicide in self-defense.

The jury found the defendant guilty of murder in the second degree, and assessed his punishment at five years' imprisonment.   The points were all saved by bills of exception, counter-instructions, and motions for a new trial. The defendant appealed.

*James H. Bell*, for appellant.—I. The court below erred in excluding from the jury the testimony offered to prove that the deceased, Brown, had made recent threats against the life of the appellant, which threats were communicated to the appellant; and that the said Brown was a man who might reasonably be expected to execute a threat made.

---

---

(Paschal's Dig., Art. 2270; Howell v. The State, 5 Ga., 54; The People v. Rector, 19 Wend., 589.)

II. The court erred in refusing instructions asked by defendant's counsel.

*E. B. Turner, Attorney General,* relied upon Lander v. The State, 12 Tex., 462.

Three things are necessary to be established, and of those things the court must be the judge before threats can be allowed at all. These things are: 1. Threats against the life of the defendant; 2. Their communication to the defendant; and, 3. That the deceased at the time of the killing did some act showing an intention to carry those threats into execution.

This is substantially the common-law rule, and the statute is nothing more than declaratory of a then existing rule. (Paschal's Dig., Art. 2270.)

There is nothing to bring the case within any of the provisions of the code as found upon page 450 of Paschal's Digest. (Hinton v. The State, 24 Tex., 454.)

CALDWELL, J.—This was an indictment for murder in the district court of Victoria county; trial at the spring term, 1868, and a conviction for murder in the second degree.

During the progress of the trial there were several exceptions to the ruling of the court, all embodied in a motion for a new trial, which was overruled, and the prisoner appealed.

Two errors are relied on for a reversal, all others having been abandoned by counsel for the prisoner in this court.

1. The court erred in its rulings, "in refusing to permit the defendant to make proof of previous threats immediately preceding the shooting, which were communicated to the defendant."

2. The court erred "in refusing to permit the defendant

to introduce proof of the violent and dangerous character of the deceased, and that he was a man likely to carry his threats into execution."

The admissibility of "threats" as evidence in justification of homicide has ever been a perplexing question, and it cannot be safely said that there is any fixed rule, assented to by jurists as a uniform one, alike applicable to all cases. Each is impressed with its peculiar surroundings, and must be judged of by them.

The Code of Criminal Procedure [Paschal's Dig., Art. 2270] provides that, "where a defendant accused of murder seeks to justify himself on the ground of threats against his own life, he may be permitted to introduce evidence of the threats made; but the same shall not be regarded as affording a justification for the offense, unless it be shown that at the time of the homicide the person killed, by some act then done, manifested an intention to execute the threat so made. In every instance where proof of threats has been made, it shall be competent to introduce evidence of the general character of the deceased. Such evidence shall extend only to an inquiry as to whether the deceased was a man of violent or dangerous character, or a man of kind and inoffensive disposition, or whether he was such a person as might reasonably be expected to execute a threat made." This we do not regard as a new rule, but a statutory declaration of the old.

The judge who presided on the trial in the court below seems to have acted upon the theory that before evidence of threats could be introduced there must have been laid a predicate in the nature of proof disclosing some act at the time of the homicide manifesting an intention to carry the supposed threats into execution, and that such acts were questions of law for the court, and not of fact to be submitted to the jury. Thus viewing the law, it was held that the circumstances surrounding the parties at the time of the killing did not furnish the required predicate.

It is an elementary rule, that if there be any evidence is a question for the judge, but its sufficiency for the purpose relied on is for the jury to determine. (1 Greenl. on Ev., § 49.) If we hold that the defendant must first prove that his antagonist manifested a hostile purpose by acts done at the time of the homicide, it would seem that antecedent threats of violence could be of no avail, because these acts of themselves would excuse, extenuate, or justify, according to their nature or grade. Thus the whole object of the law in acquainting the jury with previous threats would be defeated.

The sole object of introducing threats against a prisoner is to ascertain his frame of mind at the very moment of the commission of the homicide. It follows, then, that every circumstance, however light or trivial, that can furnish any *indicia* of this frame or condition of the mind becomes highly important, and is relevant to ascertain the intent with which the act was committed, because murder is essentially the creature of intent, and cannot exist without malice. A jury might with perfect propriety conclude that the acts of the deceased at the time of the killing were not sufficient to extenuate or justify, but, when these acts are coupled with the previous threats of violence communicated to the defendant, they may present an entirely new phase; "trifles light as air" then become pregnant with meaning, and completely negative the idea of malice.

In Rector's case, 19 Wend., 589, counsel for the prisoner offered evidence of the rioters breaking in the prisoner's house on the previous Saturday night, and that the rioters threatened to return on another night and break in unless admitted. This was offered to establish a reasonable ground for the prisoner's apprehending the execution of a similar threat now repeated. Judge COWAN held that the evidence ought to have been received, remarking that real alarm on the part of the prisoner on apparent, though unreal, grounds was pertinent to the issue. The jury might

have laid no stress upon the circumstance, but it should have been received, because we cannot say they would not. The lightness of a relevant circumstance is no argument for withholding it from the jury.

In Howell's case, 5 Georgia, 54, the distinct proposition is, whether it was competent for the defendant to prove threats by the deceased against the prisoner. Judge WAR-NER, in delivering the opinion of the court, said: "Whether the evidence was sufficient to excite the fears of a reasonable man * * was a question for the jury. The evidence was competent to show the *quo animo* of the defendant. All we can say is, that the question propounded to the witness * * was a legal and competent question. What effect the answer would have had upon the jury of course we cannot know. All we decide is, that on a trial for murder * * it is competent, under the provisions of our code, for the defendant to ask a witness if he did not know that the deceased * * made any threats to drive the prisoner from the place or take his life;" and Rector's case is cited with approbation.

When it is borne in mind that in Howell's case the deceased was approaching the prisoner without being aware of his proximity, the defendant discovered himself and fired the fatal shot, it will be seen that it is a much stronger case than the one at bar.

Lander's case, 12 Tex., 462, is relied on by the attorney general in support of the correctness of the ruling of the court below. We think it rather in affirmance of the view we take. In that case, the evidence of threats by deceased against the prisoner was admitted without objection. Nor did this court on appeal intimate that it was improperly done. It will be observed that in this case Lander, the threatened party, went about compassing the destruction of his enemy, waylaid, and shot him, when he was wholly unconscious of his presence. There could be no pretense here of acts done by the deceased at the time of the homi-

cide, and yet the threats were introduced. Lander acted upon the vulgar notion that he who threatens the life of another is an outlaw as to the person menaced, without the pale of the law, and may be circumvented and slain with impunity. The point made was as to the sufficiency of threats, unaccompanied by acts at the time of the killing, to excuse, extenuate, or justify, and it was rightly held that they were not sufficient.

Johnson's case, 27 Tex., 758, is to the same effect. Threats were introduced without objections, but it was assigned as error that the court, in the charge, withdrew from the consideration of the jury the threats as an element of the prisoner's defense. In upholding the sufficiency of the charge and its freedom from the alleged objection, Judge MOORE said: "Full two-thirds of the time the court was engaged in the trial of the cause must have been consumed in developing and expounding the evidence touching the alleged threats * * as the ground of defense." Although "these things (the threats, among others) were antecedent occurrences, is it meant to be said that they were not vital living facts and circumstances surrounding the parties at the time of the killing? How can any facts and circumstances be said to surround parties, save as they connect themselves with, and are explanatory of, their conduct and intention in the particular matter drawn in question? Shall not all those which are legitimately so connected be properly said to surround the parties?" From this it is plain the court was of the opinion that the threats were circumstances from which legitimate deductions might be drawn, and should be referred to the jury.

If, then, such an important element, in ascertaining the prisoner's frame of mind and the intent with which he committed the act, as previous threats against his life are withheld from the jury, can it be seriously insisted on that he has had a trial under the law of the land?

It was insisted on in argument that this court, upon

inspection of the whole records, might affirm the judgment, if, in its opinion, there was sufficient evidence to sustain the verdict. This is not the law. The rule may be applicable in civil cases, but not in criminal prosecutions when life is involved. A denial of any legal right is sufficient to reverse the judgment. (Phips v. The State, 3 Cold., 344.)

It is the right of the prisoner to have every relevant circumstance from which a conclusion can be drawn consistent with innocence daguerreotyped on the mind of the jury and reflected back in the shape of their verdict.

The effect of the ruling in the court below was, that the circumstances surrounding the parties, developed on the trial, were not sufficient to extenuate or justify, notwithstanding the threats. This was a question of fact for the jury, to be responded to under a proper charge of the court.

As the case must be again referred to a jury, we will only notice the facts to observe, that at the time of the homicide the parties confronted each other. The proof showed there was a present ability on the part of the deceased to execute the supposed threats; that there had been ill feeling between the parties; and an angry conversation, growing out of their differences, was going on at the time of the killing; that there were simultaneous movements by the parties of such a menacing nature as to induce one of the witnesses to seek safety in avoiding the apprehended shots of both.

We think all these circumstances should have been interpreted by the jury through the mirror of the threatened attack. We do not say they ought to have had any weight with the jury. On this point we express no opinion at all. All we decide is, that a prisoner accused of murder may introduce evidence of threats against himself by the deceased, and whether there are any acts done at the time of the killing by the deceased which will extenuate or justify is a question of fact for the jury. It follows from this that

evidence also of the character of the deceased may be in-
troduced, &c., as provided in the code. (Paschal's Dig.,
Art. 2270.)

It may be said that the policy of permitting the intro-
duction of threats as evidence before a predicate is laid
will have the effect of enabling the criminal to screen him-
self from the consequences of his crime; that the courts
should scrutinize with jealous care every avenue by which
the criminal might escape. To the former we reply, that
courts, as such, can have no policy of their own. To the
latter, as men, we may lament the prevalence of crime, and'
moreover the decadence of public virtue, evidenced by the
reckless disregard of human life; but as jurists we can only
expound the law as it has been handed down to us by the
fathers, and leave the consequences to God and the country.

The judgment of the court below, in overruling the mo-
tion for a new trial, is reversed, and the cause remanded
for another trial.

REVERSED AND REMANDED.

LINDSAY, J., dissenting.—I cannot concur in the conclu-
sions arrived at by my learned brothers in the determination
of this cause. In this case an indictment was found by the
grand jury of Victoria county for murder against the appel-
lant, Wiley W. Pridgen, upon which he was arraigned, tried,
and found guilty by the petit jury of murder in the second
degree, and his punishment assessed to be confinement in
the penitentiary of the state for a period of five years.
The judgment of the court was thereupon entered, from
which the prisoner has appealed to this court, and it is now
here for revision.

The grounds upon which a reversal is sought are, that
the court below erred in excluding from the jury, upon the
trial, testimony offered to prove that the deceased had made
threats against the life of the prisoner, which threats were
communicated to him prior to the homicide, and that the

deceased was a man who might reasonably be expected to execute a threat made.

It is insisted that the court palpably erred in denying the admissibility of the testimony offered; that the court had no right to pass a preliminary judgment upon the testimony offered, even to determine upon its relevancy, or to ascertain, if introduced, whether it would be sufficient in law to justify the homicide charged upon the prisoner. It is contended that article 2270, Paschal's Digest, of the Criminal Code, has established a new rule of evidence in criminal trials, which completely divests the judge of all discretion in the conduct of the trial in the admission or exclusion of threats which have been brought to the knowledge of the accused previous to the commission of the homicide. We cannot think that such a scope was intended to be given to this enactment by the legislature. A latitude of interpretation so dangerous to social order, and, in its practical operation, so subversive of the safeguards to all personal security, should not be indulged, unless required by the most obvious and authoritative command of the law-giver. The article in the Criminal Code is in this language: "Where a defendant, accused of murder, seeks to justify himself on the ground of threats against his own life, he may be permitted to introduce evidence of the threats made, but the same shall not be regarded as affording a justification for the offense, unless it be shown that, at the time of the homicide, the person killed, by some act then done, manifested an intention to execute the threat so made."

Such is the language of our criminal code, which it is conceived has interpolated a new rule of evidence in the criminal jurisprudence of our state. In our view, it is not a change in the common-law rule of evidence in criminal cases, but a change of the nature and character of the homicide, committed upon a knowledge of previous threats, coupled with a demonstrative attempt to carry those threats into execution at the time of the killing. In-

stead of .reducing such killing to manslaughter, as at the common law, it simply divests the killing of all malice, express or implied, and makes it justifiable homicide, according to this provision in our criminal code; while at the common law such killing would be manslaughter, and punishable accordingly.

At the common law, the accused was not debarred the privilege of proving previous threats of the deceased, when he had laid the foundation for their introduction, by showing that deceased, at the time of the killing, was making an effort to carry them into execution. And in such case, if the deceased was the aggressor in the conflict, it would be self-defense by the common law in the slayer, unless the proof developed that the accused had sought an occasion to bring on the collision. It is, then, no new rule of evidence. It is a change of the character of the homicide which this provision of the code gives to the effect of the evidence, making what was manslaughter at common law justifiable homicide by the code. Both systems permit the introduction of previous threats: the one to rebut the presumption of malice implied in the killing; the other, enlarging the liberty, if not the right, of self-defense, makes an act justifiable which by the common law was a felony. This article in the code hath this extent, no more.

The peace and good order of society, the personal security of the citizen, the protection of life against the wanton violence of the desperate and the reckless, will be put in continual jeopardy, if the principle is once established by positive law, or by judicial determination, that the judges, who preside over the public trials in criminal matters have no discretion in controlling the admissibility of testimony. This is the peculiar province of the judge, and one of the highest and most cherished attributes of the judicial function in all·trials by jury. The judge must determine the law of the case; the jury, upon both theory and principle, are the judges of the facts.

It is true, in the practical operation of our judicial system, that the juries, by their general verdicts, do actually decide both upon the law and the facts of a case; and in all acquittals, if they should decide erroneously, the results are beyond the correction of the courts. It is for this reason, according to the philosophy of our judicial system, the power of control over the admissibility of testimony is properly confided to the judge. His errors are subject to correction, by motion in arrest of judgment, for a new trial, or by appeal. The error of the jury upon a finding of "not guilty" is past all correction. In these determinations society has a deep interest, as well as the accused; and it is as equally important to its welfare that the guilty should be punished as that the innocent should be shielded and protected. Is it a principle of law, the suggestion of wisdom, the dictate of policy, or requirement of humanity, that a court, while tenderly regardful of the rights and the interest of a prisoner, should be totally indifferent to social order and personal security? The judge is no less the guardian and protector of the public weal than he is of the individual rights of the person who may be charged with a violation of the laws of the government.

The rule of action on this subject is clearly laid down by Justice STORY, in the case of the United States *v.* Bautista, 2 Sum., 243: "The jury should respond as to the facts, and the court as to the law." This is in perfect harmony with the common law, and with our own Criminal Code, which declares, in article 3058, Paschâl's Digest, that "the jury are the exclusive judges of the facts in every criminal cause, but not of the law in any case." It will be observed, from an examination of the article under consideration, that the language of it is permissive, not imperative. It is, that the accused may be permitted to introduce proof of threats. Why not have used the language of command, if it was intended to deprive the court of all discretion, and give up the authority to the jury to decide

the question of law, whether such threats were to be "regarded as affording a justification of the offense;" a pure and unmixed question of law, which, according to the code, must be judged of exclusively by the court. The questions of fact for the jury to determine were, whether the threats were made and communicated to the prisoner before the commission of the homicide, and whether at the time of the killing the deceased manifested, by any act then done, an intention to execute the threats so made. These were the simple facts, of which the jury were to judge.

If either of these facts was wanting in the proof, whose province was it to determine the legal question whether a justification of the homicide was established? The court or the jury? In legal contemplation both facts must concur to establish the justification. Is justification a conclusion of law, or a mere finding of facts by the jury? If it be a conclusion of law, then, by the code, the jury are the judges "of the law in no case." One of these facts being wanting in the proof embracing the threats proposed, and no promise or assurance being given by the party that this hiatus would be filled—that this link in the broken chain would be supplied in the further progress of the trial—the judge could not shirk the legal responsibility of declaring that there was no evidence conducing to establish a justification under the law, without proving false to duty and recreant to the interest of society. If this view of the law be not correct, it is needless to seek in political causes a reason for the alarming and disgraceful frequency of homicides in our community. It may readily be found as an inherent vice in our criminal law or in its judicial administration. When, in fact, the *res gestæ* had already been made manifest to the court, who was to determine the question of law, whether there was any evidence in the case which, in the language of the code, could be "regarded as affording a justification of the offense," the court or the jury? Who was to judge, after a full detail of all the

"acts done" at the time of the homicide, whether any act was then done which superinduced the legal necessity or the judicial propriety of permitting the accused to introduce previous threats, brought to his knowledge before the killing took place? It was the province of the court so to judge, and the court alone. If there was no act then done manifesting an intention to execute the threats, the threats, however numerous and violent they might have been, were improper testimony for the jury, because, in the philosophy of the law, they would serve only to bias and prejudice the minds of the jury, and thus defeat the pure administration of justice. There was no evidence of justification. The question of justification is a deduction of law from the facts. Threats alone cannot constitute it. There was, then, no evidence of justification, unless the deceased at the time of the homicide was manifesting, by a positive act then done, an intention to execute the threats. It is an unquestioned rule of law that the judge alone is to determine whether there be any evidence to establish a legal proposition or consequence. The jury, when there is evidence, are the sole judges of its sufficiency.

There was not a single witness, who was present at the time of the homicide, and who testified on the trial, among the five who were present, who would venture to state that the deceased made any attempt, by any act then done, at violence upon the person of the accused. The immediate transaction was utterly barren of all such proof. If, upon the testimony given in this case of the "acts done" at the time of the homicide, they can be tortured into circumstances even conducing to prove that the deceased manifested an intention to carry previous threats into execution, then, in open, public homicides, the flash of the eye, the curl of the lip, the elevation of the nose, the passionate intonations of the voice, the crimsoned flush of the cheeks, the slightest deviation from the quiet repose of a statue, become legal synonyms of "acts done" at the time of the

homicide, and every manslayer will find his perfect vindi-
cation and legal justification in the "acts done" by his un-
fortunate victim.   Such an interpretation of our criminal
law should not be given, unless its language be so plain
and explicit as to leave no room for construction, because
the mischiefs which will inevitably result in its practical
operations upon society are beyond computation.  In effect,
it stamps the signet of impurity upon every open, public
homicide which may ever after be committed in the com-
munity.

The judge, in our opinion, violated no rule of evidence,
in exercising his discretion, by excluding the testimony
offered.   The inquiry then recurs, did he, when all the
facts constituting the *res gestæ* are taken into consideration,
exercise that discretion soundly in rejecting the testimony
offered to prove threats?   This certainly depended upon
the facts already proved, or pledged to be proved, in the
subsequent progress of the trial, which might establish
their materiality as a ground of justification.   If the prop-
osition be true, as we think the law clearly settles, that
the judge has the right to exercise his judgment in deter-
mining upon the relevancy of testimony in revising his
judgment in this case, we, as judges of the law, are bound
to make the extraordinary assumption, that the threats
proposed to be proved, in conjunction with what had
already been proved of the immediate circumstances of
the killing, were a justification in law, when in fact it
might be that not a single member of the court so believed.
For we are simply required to revise his judgment upon
the law as to the conclusion, whether, if let in, the proof
would be sufficient to establish the justification.

With the exercise of the discretion of inferior tribunals
appellate courts are little inclined to interfere.   And they
rarely ever do interfere, unless manifest and palpable wrong
has been committed.   There is a philosophical reason why
they do ordinarily refuse to interfere with the legal dis-

cretion of inferior tribunals. It is because such tribunals are in closer contiguity with the scenes and incidents of the transactions upon which they are called to pass judgment, and they are required to hear direct and immediate rehearsals of the whole drama, which gives them better opportunities of considering and weighing all the concomitant and adventitious circumstances inseparable from all such trials, but which cannot be photographed and transferred to the record for the revision of an appellate court. I cannot perceive that any manifest wrong has been done to the prisoner in this case. On the contrary, from the clear and explicit detail of the facts, occurring at the time of the tragedy, the prisoner received as favorable a verdict from the hands of the jury as he had any just right to expect.

NOTE BY LINDSAY.—The evidence of the facts occurring at the time of the killing:

Daniel Weiseger stated that he was sitting with the deceased near the stove, talking of matters not connected with the prisoner. Prisoner and Mr. Spear rode up; both spoke. Deceased did not return the salutation. Prisoner took his seat in a chair near the door. Afterwards deceased entered by another door and took his seat on the counter, ten or twelve feet from prisoner. Deceased asked prisoner if he had found his horse. Prisoner said he had not. Deceased told prisoner the horse was in his brother's field. Prisoner then told deceased he thought it ungenerous in deceased to employ that young man Thompson; that Thompson had been in prisoner's employ, and he was on his bail bond, and could deliver him up at any time. Deceased said Thompson was a free man. Deceased said that the prisoner had charged him, the deceased, with being concerned in stealing the horse. Prisoner denied it and demanded his author. Deceased pointed to witness, who said he had heard it. Prisoner then asked witness his author. Prisoner then said to deceased, I don't care for you. Deceased replied, No, and nobody cares for you; when prisoner rose to his feet and advanced two or three steps, making the remark, "Do you," or "Don't you draw your six-shooter on me." Witness did not see deceased at the time; saw the flash of the first pistol-shot in the hand of prisoner; heard the report of the other two. The first was the one in the breast. He saw no pistol in the hand of deceased; saw one on his person after he fell, on his back, in the scabbard.

John Clark stated he was present when prisoner came in the store and took his seat, as stated by first witness. Deceased entered shortly after and took

his seat on the counter, as stated, and inquired of prisoner if he had his horse. He said no, and deceased told him where his horse was. Prisoner said to deceased he ought to have hung the young man Thompson. Deceased said he had hired Thompson to go with him on the trip. Prisoner said, I think you did wrong, knowing he had been in my employment, and I was bound on a bond for his appearance at court, and had a right to deliver him up at any time. Deceased said he knew nothing of it, but thought Thompson was free to do as he pleased if he behaved himself. Prisoner said he had done wrong. Deceased told prisoner he had circulated a statement that deceased was implicated with Thompson in stealing horses. Prisoner denied it and demanded his author. Deceased referred him to Daniel Weiseger, who was present. Weiseger said he had heard so, and stated from whom he heard it. Prisoner then rose from his chair and advanced one step, saying he didn't care, when deceased attempted to get off the counter, which he seemed to have some difficulty in doing quickly, and made one or more efforts before he succeeded. It appeared to witness that his six-shooter, which was belted round him, was hitched or entangled in something on the counter. Prisoner advanced no farther until deceased got upon his feet off the counter; but prisoner had his six-shooter when he took the first step. Deceased advanced one step when he got to the floor, and prisoner advanced and commenced shooting, firing twice, as fast as the lock could revolve. Both took effect, one in the neck, the other in the breast. Witness' position was such that he could see both parties. While deceased was sitting on the counter, during the altercation, he was holding the edge of the counter with both hands by his sides. When prisoner fired both shots deceased's hands were at his sides and nothing in them. At no time during the altercation did the deceased make any attempt to get hold of his pistol or to make use of it. Witness was sitting facing deceased, and saw every motion he made.

John M. Field stated was present at the homicide; that the position of the parties was as stated by the other witnesses. The prisoner, after denying that he implicated deceased in horse-stealing and Daniel Weiseger had given his author, became excited, and rose from his chair, and advanced towards deceased one step, with his pistol in his hand, saying he didn't care who said so, when deceased said, I don't care for you. Prisoner then said, "Don't draw your six-shooter." My attention was then on prisoner, seeing his pistol in his hand. Prisoner fired soon after deceased left the counter. Witness tried to prevent the second shot, but it was too quick for him. Witness is positive that when prisoner rose from his chair and made a step towards deceased he said, "Don't," or "Do you draw your six-shooter on me?" Witness did not see deceased at any time attempt to draw his pistol or make any demonstration. After deceased fell witness went to him and found his pistol belted around him on his back.

H. F. Spear stated (omitting what he states about what occurred previous to his arrival at the place of the homicide, and confirming the other witnesses about the position of the parties) that he was sitting near the place occupied

by the deceased on the counter. He says, when deceased asked the prisoner if he had got his stolen horse, the prisoner said, No; and, perhaps, inquired if he knew anything about him. Deceased told him the horse was over in his brother's pasture. Deceased then said, I understand you said I helped to steal your horse. Prisoner denied saying so, and asked for his author. Deceased then pointed to Daniel Weiseger. Prisoner then inquired of Mr. Weiseger, who said he had told him so, and gave his author, when the remark was made by both, "I don't care for you;" witness don't know which spoke it first, and both rose to their feet from their sitting postures. Prisoner said something about deceased drawing his six-shooter, but does not recollect whether before or after the first shot; the shot was almost simultaneous with the remark; first shot he thinks struck deceased in the neck, the second in the breast, when the deceased got to the door into the yard that a third shot was fired, which, witness thinks, struck deceased in the hand. He died in about five minutes after getting out of the house, and twenty yards from it. John Field tried to arrest prisoner, but, no one assisting, prisoner mounted his horse and rode off. Witness' attention was principally directed to the prisoner; his impression is both were in a belligerent attitude from the time they rose to their feet; they were both armed with six-shooters, as they are called, upon their persons, and witness thought of nothing else at the time, and was trying to keep himself out of the range of both. Deceased, just before he sprang from the counter, put his hand behind him, but witness could not see him put his hand on his pistol, because his pistol was in his belt behind him, and deceased was rather facing towards witness; deceased's pistol was loaded; deceased spoke as if he was angry in the conversation between him and the prisoner.

William Daly, witness for prisoner, stated that he was present at the homicide; that he thinks when prisoner first arrived at the store he passed to the cistern in the yard, and returned and took his seat, as already stated by witnesses, and was smoking his pipe when deceased came into the store. Deceased addressed some words to Mr. Spear, the owner of the store, which he didn't hear, and seated himself on the counter, and asked prisoner if he had got or found his horse. Prisoner said he had not. Deceased told him that he [the horse] was over at his brother's. Prisoner said he thought it very wrong for deceased to take that young man Thompson; that he had boarded and clothed him when he was at prisoner's house, and that he was on his bond, and could arrest him at any time he chose. Deceased said he saw nothing wrong about it, with other words about the privilege of free persons. After this there was silence between them for a few seconds, when deceased accused prisoner of stating that he was concerned in stealing said horse, and pointed to Mr. Weiseger; prisoner appealed to Mr. Weiseger, who said he had heard so, and gave his author. Previous to this last conversation, and while they were talking about the rights of free persons, deceased, while sitting on the counter, put his hand behind him, and was moving his hand to and fro appearing to be in a restless condition. When Weiseger had told him what he had heard and

who was his author prisoner rose from his chair, and said he didn't care what him or any other man had said, and advanced a step towards deceased; deceased said, "Neither do I care for you." This was before deceased left the counter. He then got off the counter on his feet, and advanced a step towards defendant. Up to this time witness didn't see either draw weapons, nor did he see any in the hands of either till he heard the reports of the pistol in the hands of the prisoner; both were talking; there was confusion; cannot state what was said; the first shot made by prisoner was on his taking the second step towards deceased; others about the time were between witness and deceased, so that he couldn't see his actions; saw and heard two shots fired by the prisoner; he thinks the conversation carried on between them was an angry one on the part of the deceased; he thinks the prisoner was composed till he sprang to his feet, when Weiseger told what he had heard.

The above was all the evidence of the "acts done," and even of the words spoken, at the time of the killing.