## JAMES STEWART v. THE STATE.

### No. 1044.   Decided May 27th, 1896.

**1.   Homicide—Threats as Evidence.**

As a general proposition, with but few exceptions, in every case of homicide, threats, communicated or uncommunicated, are admissible in evidence, though, in certain character of oases, where their exclusion could not possibly injure the rights of the defendant, it would not be error for the court to reject them.

**2.   Same—Uncommunicated Threats.**

In a case of homicide, whenever the evidence leaves it doubtful as to who began the difficulty or made the first hostile demonstration, evidence of uncommunicated threats, made by the deceased, is relevant as evidence tending to show which of the parties most likely began the difficulty.

**3.   Same—Conflicting Evidence.**

On a trial for murder, where the testimony of the eye-witnesses was conflicting, as to which one of the parties, the deceased or the defendant, made the first hostile demonstration.   Held:   Error, for the court to exclude evidence of uncommunicated threats by the deceased.

APPEAL from the District Court of Karnes.   Tried below before Hon. S. F. GRIMES.

This appeal is from a conviction for murder in the second degree, the punishment being assessed at twenty years' imprisonment in the penitentiary.

The opinion states the case.

[No brief for either party found with the record.]

*Mann Trice*, Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and given twenty years in the penitentiary, and prosecutes this appeal.   There is but one question in this case, and that involves the action of the court in refusing to admit the testimony of certain witnesses as to threats made by the deceased.   Said bill of exceptions is as follows:   "The defendant offered the following testimony, to-wit, by witness, Marcos Hines:   That a short while, perhaps two weeks, before the killing of Paul Jones by defendant, the deceased, Theo. Butler, and I were standing at the corner of C. P. Dailey's store, in Kenedy, and Butler was talking to deceased about the difficulties he was having, and so on, and deceased said 'Jim Stewart (meaning defendant) says he is going to whip Henry (meaning witness, Henry Jones), and, if he puts his hands on Henry, I am going to kill him.' The defendant also offered the same testimony by Theo. Butler, and said witnesses would have testified to the facts as above set forth if they had been permitted by the court.   The defendant offered this testimony for the purpose of showing a threat to take the life of defendant by deceased, it having been, in the early part of the trial, shown by the State that defendant did put his hands on Henry Jones; and the State objected to the admission of said proposed testimony when offered, upon the following grounds, to-wit:   That the threat made by deceased against

the life of defendant was a conditional threat, and the court sustained said objection, and excluded said testimony, to which decision of the court the defendant then excepted." The bill of exceptions does not state that the threat was communicated, and we cannot presume it was, and will treat the same as an uncommunicated threat. Before proceeding to a discussion of the action of the court, we will state the material facts of the case, so that the question may be fairly presented: The evidence for the State shows that, for some weeks prior to the homicide, a state of ill feeling existed between the appellant and the deceased, Paul Jones, and his brother, Henry Jones. On Friday night, before the killing, which occurred on Sunday morning, it appears that the deceased and his brother, Henry, went to the house of one Clarissa Murphy, who lived in the village of Kenedy, where all of the parties lived; and it appears that a wordy altercation occurred between Henry Jones and the defendant in regard to some women, one of whom was the defendant's sister, Julia. On the next day the defendant came into the cow pen where Henry was milking, and came up behind him, and hit him. As stated by Henry: "The defendant hit me because I had raised a row with him for going over to the house where Clarissa Murphy and his sister, Julia were." This occurred on Saturday morning. On Sunday morning following, it appears by the testimony of the State (and this is not gainsaid by the other witnesses) that, about 10 o'clock, Paul Jones, deceased, and defendant met about fifty or sixty yards from the house where the row was on Friday night. Paul said, "Hello, Jim." Jim said, "Hello, hell; no hello here for you." The defendant and the deceased were then about three or four steps apart. Defendant pulled his pistol, and cocked it in the face of the deceased. Deceased grabbed it by the barrel, and wrenched it out of the defendant's hands. The deceased had his own pistol with him at the time, and, as he walked away, he pulled it out and said, "Jim, I have my pistol, too." And he went on off, and carried both pistols with him, but did not attempt to shoot the defendant, though he could have shot him, if he had wanted to. After this, the deceased went off to the livery stable, to get a buggy to go to church. He got the buggy from the stable of one Alexander. It was a two-horse buggy, and had a top to it, but there were no side curtains, and the back curtain was rolled up. The deceased started, driving the buggy along the road, in the direction of the house, where Clarissa Murphy and Julia Jones lived. He saw the defendant coming towards him while he was driving his buggy, and defendant motioned to him to stop, and then called to him to stop. Deceased pulled up the team, and stopped. Defendant came up in front of the horses, and passed on around one side of the buggy, and stopped just back of the buggy. All of the witnesses substantially agree up to this point as to the difficulty on Sunday morning, which ended in the homicide. At this juncture, two State's witnesses testified as to the facts for the State, and one witness testified for the defendant. The State's evidence showed that the defendant stopped

just in the rear of the buggy, he being on foot. Deceased laid the lines down on the dashboard, and turned around on the seat, and faced the defendant. Deceased was sitting on the seat, and his arms crossed each other on the back of the seat. Defendant said to the deceased, "I want my pistol." Deceased said, "I will give you your pistol when you give Henry his pistol" (meaning Henry Jones, the brother of the deceased). Then the deceased turned his head, and looked towards Charley Ray, who was also present; and just at this time the defendant pulled a pistol out of his pants, and shot deceased. He fired one shot, and then dropped the pistol over in the buggy, and ran off towards the brush. Deceased, after he was shot, turned around on the buggy seat, grabbed the lines, as the horses were moving off, and circled the team around, and got his pistol, and shot twice at the defendant, as he was running off towards the brush. The witness, Henry Jones, then went to the buggy, and the deceased said, "Boys, he has killed me; don't let him get away;" and witness then took the deceased's pistol, and shot once at the defendant as he ran off. Deceased expired a short time after he was shot. Charley Ray, the other witness for the State, substantially agrees with this relation of the facts. He states that, after deceased was shot, deceased turned round in his seat, caught the lines and checked up the horse, and reached down and got a pistol, and then fired two shots at the defendant, etc. Napoleon Burns, for the appellant, states that he was present at the shooting; that the defendant walked up first by the side of the horses, and then on around behind the buggy. Defendant said to the deceased, "Paul, give me my pistol." Deceased said, "I will give you your pistol when you give Henry his." Deceased then said, "Jim, you acted damned shabby the other night, and I will kill any God damned son-of-a-bitch that will do like you did," and at the same time grabbed his pistol with his left hand (deceased was left-handed); and the defendant then pulled his pistol, and just as deceased got hold of his pistol, and had it partly out of his pants, defendant shot him and ran. "I saw the pistol in the deceased's hand when the defendant fired. As defendant ran off, deceased shot at him, as did also Henry Jones." The court admitted in evidence threats made by the deceased against the defendant on that Sunday morning. One Ed Fant testified: That the deceased drove by his house, and asked if the defendant was there. The witness told him, "No," and deceased said, "I am going to kill the God damned black son-of-a-bitch," and then drove off. That, in a few minutes thereafter, he heard the shots which killed him. Alice Fant, the wife of Ed Fant, also testified to the same threats. Lena Billips testified that, at the row Friday night, deceased told the defendant to come out of the house, and he would "put a bullet between his God damned eyes," and said, "You had just as well come out; I am going to kill you." May Stewart testified to the same threat, and, in addition, that the deceased told the defendant that he had jumped on Henry, a boy, but was afraid to fight him. All of these threats (except those testified to by Lena Billips and May Stewart, which were made, according

to their testimony, to the defendant himself) were uncommunicated threats, so far as the evidence in this cases discloses.

This is about the shape in which the evidence leaves the case, and the question now presented to us is, was it error for the court to refuse to admit the testimony of the two witnesses to the uncommunicated threats to which they would testify. Communicated threats are admissible, under our statute, in connection with some overt act, in all cases of homicide, as affording a ground of justification. In Howard v. State, 23 Tex. Crim. App., 265, it was said by the court "that threats are not to be excluded because no predicate has been laid for their introduction by proof of an overt act on the part of the injured party. From all the authorities, the true doctrine is to be adduced, that threats are by law per se admissible as independent evidence." In Penland's case, 19 Tex. Crim. App., 365, it was held that the court did not err in excluding evidence of threats under the particular circumstances of that case. The evidence in that case showed an assassination by waylaying, so that evidence of threats could have afforded no justification; nor would they have served the purpose of explaining any act of deceased or defendant. In Irwin v. State, 43 Texas, 236, under the peculiar facts of that case, it was held that there was no error in excluding previous threats of the deceased, there being already in the case a number of threats. The court says in this connection: "Now, as there was no act of the deceased proved at the time of the killing indicating an intention to carry out his threats at that time, the previous threats made by him could constitute no part of a defense for taking his life at that time. Therefore, we cannot now hold that it was error in the court to exclude the evidence of threats and violent character of the deceased, which, if admitted, would have been only an additional accumulation of the great amount of evidence on these subjects which had already been admitted, all of which did not, and under the law, as properly charged by the court, could not, avail the defendant as constituting an element in his defense, under the facts and circumstances of the case as proved on the trial." As stated, however, as a general proposition, the authorities concur, with but few exceptions, that, in every case of homicide, threats communicated or uncommunicated are admissible. Of course, in certain character of cases, where their exclusion could not possibly injure the rights of the defendant, it would not be error for the court to reject them. We gather from the authorities that in every case uncommunicated threats are admissible where they would tend to throw any light upon the transaction. We understand the rule to be that wherever the evidence leaves the question doubtful as to who began the difficulty or made the first hostile demonstration, that evidence of uncommunicated threats made by the deceased is relevant as evidence, as showing who was most likely to have begun the difficulty. See, Horbach v. State, 43 Texas, 242; Tankersley v. State, 31 Tex. Crim. Rep., 595; Stokes' case, 53 N. Y., 164, cited in Hor. & T. Cas., and authorities there quoted.

In the case before us, it will be noted that the learned judge excluded

said testimony, on the ground that the threat was conditional, but his. very certificate shows that, if said threat when made was conditional, the condition had happened which made it absolute; that is, the deceased' said that, if the defendant put his hand on Henry, he was going to kill him. The facts show, if we refer to the statement of facts, that the de- fendant had put his hand on Henry, and had assaulted him; and the bill of exceptions, as certified to by the judge, shows that fact, so that the ground assigned by the judge for the exclusion of said testimony is not tenable, and, the threat having become absolute, it was as much admis-- sible as the threats made by the deceased on the morning of the homi- cide, which were admitted by the court. So that the bare question be- fore us is, would uncommunicated threats serve as a factor with the jury to enable them to solve any question in this case? Not being communi-- cated, they could not operate on the mind of the defendant. But this is. not the question, would they serve to shed any light upon the transac- tion immediately attending the homicide, as to who was the aggressor, or who made the first hostile demonstration? If it be conceded that the defendant provoked the difficulty for the purpose of killing, and he stopped the deceased with that intent, then threats made by the deceased could serve no purpose. It may be that that was the intent of the de- fendant in stopping the deceased, or defendant may have stopped him for the purpose of procuring his pistol from him, of which he had been disarmed by the deceased on that morning. This he had a perfect right. to do in a peaceful manner. The evidence presents both of these theories for the consideration of the jury; and, if the State's witnesses are to be believed, the purpose of the defendant in stopping the deceased, was to have an occasion to kill him. They testify that the deceased did no act, and made no demonstration that could be construed by the defendant into a hostile character; and, if this was the only testimony in the case, the court may have been justified in excluding from the consideration of the jury all threats. But another theory was presented by the testimony of the defendant's witness, and he testified that the defendant did no more than stop the deceased, and ask him to give him his pistol, and de- ceased replied: "I will give you your pistol when you give Henry his," and told the defendant, "You acted damned shabby the other night, and I will kill any God damned son-of-a-bitch that will do like you did," and at the same time grabbed his pistol, and that then the defendant shot him,. and ran. Now, if the defendant approached the deceased on a peaceful mission to obtain his pistol, and the deceased denounced him, and began to draw his pistol or reach for it, and the jury should believe this version of the affair, the defendant was justified in what he did. Evidently, the jury did not credit the defendant's witness. Would not the fact that the deceased had previously threatened to do what the witness, Burns, said he did, tend to support him? Unquestionably it would. Nor is it an answer to the proposition to say that the court did admit testimony of previous uncommunicated threats made by deceased against the defendant on that very morning. The defend--

ant upon that issue had a right to every particle of testimony, which would tend to strengthen and corroborate the testimony of his witness. It may be that the jury, from some cause, might have a reasonable doubt as to the statements of the witness who testified upon this point, whereas they might have believed the testimony of the two witnesses who would have testified to the threats which were excluded. But no matter; we are not permitted to speculate as to what view the jury may have taken of this matter. It was testimony to which the defendant was entitled, and, whether it was worth much or little, he should not have been deprived of it. As said in Pridgen v. State, 31 Texas, 420: "It was insisted in argument that this court, upon inspection of the whole record, might affirm the judgment, if, in its opinion, there was sufficient evidence to sustain the verdict. This is not the law. The rule may be applicable in civil cases, but not in criminal prosecutions, when life is involved. The denial of any legal right is sufficient to reverse the judgment. It is the right of the prisoner to have every relevant circumstance from which a conclusion can be drawn consistent with innocence daguerreotyped on the mind of the jury, and reflected back in the shape of their verdict." It will be noticed here that this is not a case where the evidence, when taken together, leaves it ambiguous or doubtful as to who began the attack, but it is a case where the evidence of controverting witnesses clashes, and they antagonize each other as to this question, and the issue is made by controverting evidence; and, in either state of case, we hold that the defendant has a right to every circumstance which would serve to strengthen and corroborate his testimony before the jury, so that, in passing upon the contradictory evidence, they might weigh all the probabilities in the case. By the action of the court in excluding the testimony sought to be adduced, the jury were deprived of testimony which the defendant had a right to have considered by them. We would further suggest that the court, having given a charge on provoking the difficulty, should have also given a charge on the converse of that proposition, predicated upon the rights of the appellant in case the jury should believe that he halted the deceased, and accosted him on a peaceful mission, for the purpose of procuring his pistol. The judgment is reversed, and the cause remanded.

*Reversed and Remanded.*