## J. W. KEETON v. THE STATE.

### No. 441.  Decided March 23, 1910.

### Rehearing denied May 18, 1910.

**1.—Murder—Continuance—Want of Diligence.**

Where, upon trial of murder, the application for continuance did not show proper diligence, there was no error in overruling same.

**2.—Same—Evidence—Declarations by Defendant—Arrest.**

Where, upon trial of murder, the State introduced in evidence certain statements by defendant as to whether he had been to the courthouse on the morning of the alleged killing, etc., and it appeared that defendant was on bail at the time and not under arrest, there was no error.

**3.—Same—Evidence—Credibility of Witness.**

Upon trial of murder, where defendant's witness on cross-examination by the State was asked whether he had not been indicted for ·failure to suppress gambling houses, etc., and the witness answered that he did not know what the indictment contained, this was equivalent to not answering the question at. all, and there was no error.

**4.—Same—Evidence—Bill of Exceptions.**

Where, upon appeal from a conviction of murder, the record showed that

the court refused to approve the bill of exceptions to perpetuate an objection to the testimony of the witness, there was nothing presented for review; besides the question asked the witness as to the whereabouts of the defendant on the morning of the homicide was legitimate.

### 5.—Same—Remarks of Judge—Practice in District Court.

Where, upon appeal from a conviction of murder, it appeared from the record that no opportunity was afforded the court by objections made to the remarks of the court, so that he could explain or withdraw them, and that the court's attention was not called to this matter at the time, and the defendant accepted the bill of exceptions as qualified by the trial judge, there was no error.

### 6.—Same—Evidence—Res Gestae—Contradicting Witness.

Upon trial of murder, where the defendant asked his witness as to when he learned the deceased had been shot, to which he answered that defendant came out of the room to give up, there was no error in permitting the State's counsel on cross-examination to show that this witness stated, as he ran out of the room where the shooting took place, and said that the defendant had killed the deceased; this testimony was admissible both as contradicting witness' testimony in chief, as well as res gestae.

### 7.—Same—Evidence—Moral Turpitude.

Upon trial of murder, where there was no objection to the answer of defendant's witness that he had been indicted of official misconduct and misappropriation of public money, except that the indictment was the best evidence, there was no error.

### 8.—Same—Defendant as a Witness—Evidence—Cross-Examination.

Where, upon trial of murder, defendant's counsel permitted defendant to testify with reference to certain assaults for which he had been indicted, there was no error in permitting the State's counsel on cross-examination to ask the defendant whether he had not been indicted for an assault and battery committed in the sheriff's office because the man was not supporting the sheriff's candidacy.

### 9.—Same—Charge of Court—Special Charges.

Where, upon trial of murder, all the questions presented in the refused requested charges were covered by the main charge of the court, there was no error.

### 10.—Same—Charge of Court—Provoking Difficulty—Objections to Court's Charge.

An exception generally to the charge of the court is insufficient, and an exception to the charge of the court to be entitled to notice on appeal must point out the objection. Following Thompson v. State, 32 Texas Crim. Rep., 265, and other cases.

### 11.—Same—Charge of Court—Provoking Difficulty—Murder—Manslaughter.

Where, upon trial of murder, the evidence showed that if the difficulty was provoked at all it was with the intention to kill the deceased, there was no error in the court's failure to charge the jury that if the defendant provoked the difficulty with an intention only to inflict an ordinary battery then he would not be guilty of murder.

### 12.—Same—Charge of Court—Burden of Proof.

Where, upon trial of murder, the charge of the court on provoking the difficulty did not throw the burden of proof upon the defendant, there was no error.

### 13.—Same—Charge of Court—Provoking Difficulty.

Where, upon trial of murder, the defendant requested a charge on the question of provoking the difficulty which excluded from the consideration of the jury the purpose and intent of the defendant in using language towards the de-

ceased that was calculated to provoke a difficulty, the court did not err in refusing the same; the court having properly applied the law to the facts upon this issue in his main charge, construed as a whole.

**14.—Same—Charge of Court—Preliminary Statement—Provoking Difficulty.**

Where, upon trial of murder, the court in his preliminary statement of his charge on provoking the difficulty used language that was subject to criticism, but when he came to apply the law to the facts of the case he stated the matter correctly, the same is not cause for reversal. Following Railsback v. State, 53 Texas Crim. Rep., 542.

**15.—Same—Charge of Court—Provoking Difficulty—Serious Bodily Injury—Manslaughter.**

Upon trial of murder, where the court charged the jury that if the defendant provoked the difficulty with the intent to inflict death or serious bodily injury, he would be guilty of murder either in the first or second degree, there was no error; and the contention that if defendant provoked the difficulty to inflict an injury less than death, then it would be only manslaughter, is untenable. Following Green v. State, 12 Texas Crim. App., 445, and other cases.

Appeal from the District Court of Wilbarger. Tried below. before the Honorable S. P. Huff.

Appeal from a conviction of murder in the second degree; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

*R. W. Hall* and *W. D. Berry* and *Reeder, Graham & Williams*, for appellant.—As to question of admitting declarations of defendant and as to when accused was under arrest: Nolen v. State, 9 Texas Crim. App., 419; Grosse v. State, 11 Texas Crim. App., 364; Cain v. State, 18 Texas, 391; Greer v. State, 31 Texas, 129; Williams v. State, 37 Texas, 474; Angell v. State, 8 Texas Crim. App., 451; Womack v. State, 16 Texas Crim. App., 178.

On question of moral turpitude: Brittain v. State, 36 Texas Crim. Rep., 406, 37 S. W. Rep., 758; Goode v. State, 32 Texas Crim. Rep., 505, 24 S. W. Rep., 102; Williford v. State, 36 Texas Crim. Rep., 414, 37 S. W. Rep., 761; Gray v. State, 86 S. W. Rep., 764.

On question of remark by judge: Butler v. State, 3 Texas Crim. App., 48.

On question of declarations of third party: Washington v. State, 17 Texas Crim. App., 197; Coker v. State, 35 Texas Crim. Rep., 57; Casey v. State, 50 Texas Crim. Rep., 392, 97 S. W. Rep., 496.

On question of court's charge on self-defense: Hawkins v. State, 36 S. W. Rep., 443; White v. State, 68 S. W. Rep., 689; Vance v. State, 45 Texas Crim. Rep., 434, 77 S. W. Rep., 817; Pratt v. State, 50 Texas Crim. Rep., 227, 96 S. W. Rep., 8; Henderson v. State, 51 Texas Crim. Rep., 193, 101 S. W. Rep., 245; Gray v. State, 55 Texas Crim. Rep., 90, 114 S. W. Rep., 635.

On question of court's failure to charge on manslaughter: King v. State, 13 Texas Crim. App., 277; Carter v. State, 37 Texas Crim.

Rep., 403, 35 S. W. Rep., 378; Hawkins v. State, 36 S. W. Rep., 443; Rice v. State, 51 Texas Crim. Rep., 255, 103 S. W. Rep., 1156.

*John A. Mobley,* Assistant Attorney-General, for the State.

On question of court's charge on provoking difficulty: Sprinkle v. State, 49 Texas Crim. Rep., 224, 91 S. W. Rep., 787; Prescott v. State, 52 Texas Crim. Rep., 35, 105 S. W. Rep., 192.

McCORD, JUDGE.—This is an appeal from a conviction for murder in the second degree, the penalty being assessed at five years confinement in the penitentiary.

On January 5, 1909, in the city of Amarillo, Potter County, the appellant, J. W. Keeton, shot and killed N. P. Thomas, said killing occurring in the lower story of the courthouse. On the 5th day of July thereafter indictment was returned against appellant charging him with the murder of the said Thomas and on motion the venue of the case was changed to Wilbarger County, and a trial had at the September term of said court resulting in appellant's conviction as before stated. The appellant, Keeton, was deputy sheriff and the jailer for J. E. Hughes, sheriff of Potter County. The deceased, N. P. Thomas, was a State ranger and had been located at Amarillo for some time. Friction and ill feeling sprang up between the sheriff's department and the said Thomas and it may be stated that bad blood existed between them. A few days before the killing there was a man by the name of Banister in jail in Potter County who had been arrested for an offense committed in Arkansas. This prisoner had, so the appellant claimed, been delivered to the sheriff of Arkansas by the said Thomas who had induced him, the jailer, to turn Banister over to him to examine some papers. An article had been published in the paper severely arraigning the deceased for his connection with the prisoner being taken out of the custody of the appellant and turned over to the Arkansas officer. On the morning of the killing, the deceased, Thomas, appeared at the county attorney's office in the courthouse on the lower floor and while there engaged in a conversation with a lawyer named Jackson in which Thomas was trying to secure the services of Jackson to defend him. It seems the county attorney had two offices and it was in the back, or rear office, where the deceased and Jackson had this conversation. While they were engaged in conversation Underwood, the county attorney, and a Mr. Richardson left the office and went into an adjoining office. Jackson had about finished his conversation with Thomas and the witness Jackson says, he was pausing until he could find a quitting place in the conversation so that he could walk out; that Thomas was sitting down behind a table with his back to the wall and one leg thrown up on the table; that at that moment the appellant came into the room from

the east door which separated this room from the county judge's room. Appellant walked close to the end of the table; that as he did so, the deceased looked around and said: "Hello, Jim!" and Keeton replied, "Hello!" that Thomas then turned back towards the witness Jackson and just at this moment Mr. Hughes, the sheriff, stepped into the room through the door in the south part of the room that separated the two offices of the county attorney, and Hughes remarked, "Hello, Doc, when did you get back?" that Thomas replied, "Good morning, Mr. Hughes," and said something about when he got back. Hughes said: "You gave us a double deal on that prisoner;" that Thomas replied: "No, Mr. Hughes, you are mistaken about that." As Hughes said this, Jackson started out, going through the door through which Hughes had entered; that as he started out he heard Hughes say, "Who was it then?" that the witness did not catch Thomas' reply, but says he had taken a step or two when he heard Keeton say, "There is not any use of telling a dirty, or damn lie about it," and the dirty lie was repeated and a gun fired. The firing of the shot was almost simultaneous with the statement of the appellant that he, deceased, was a dirty liar; that but one shot was fired, which struck Thomas in the head, killing him almost instantly. This witness says that as he started to walk out Thomas was sitting in a chair behind the table; that his hat was in his lap and that his hands were also in his lap; that he, the witness, had passed through the door when the shot was fired and at the time the shot was fired Hughes, the sheriff, was coming out of the room behind the witness and through the said door. As Hughes walked through the room he made the remark, "He has killed him;" that it must have been about ten seconds after the shot was fired when Hughes made this remark. This witness further states that when Keeton entered the room Thomas turned and spoke to him and then turned back to the witness to continue his conversation; that at that instant Hughes appeared in the room. The witness further stated that the appellant's voice when he came in and said "hello" sounded a little more husky than natural and that as Hughes walked in he seemed to be paler than usual; that Hughes had a tremor in his voice when he spoke; had a pencil in his hand and was trembling just a little and was a little pale. The witness further stated that he saw no difference in the appearance of Thomas; that when Hughes came in and spoke to Thomas the only move that he noticed Thomas make was that he slipped deeper into his chair, or slipped up a little and moved his hat further down on his legs; that Thomas was sitting pretty close to the table and was pretty well up on the table with his feet; that Keeton, when he walked in the room, had his hands in his pants pockets; that when the parties rushed into the room they found the deceased sitting back in the chair with his hands dropped down to his side and a pistol wound right above his eye. Judge Jeeter,

county judge of Potter County, testified that he was in his office writing at the time the shot was fired; that the county attorney's offices are directly west of his offices; that Keeton passed through his office shortly before the shot was fired; that he spoke to him as he passed; that he, witness, heard some talking after Keeton went into the county attorney's office; that he could not distinguish what was said but heard the pistol fire, and when he heard the shot fired he rushed through the door out of the room in which he was at the time into his other room and put himself in a position where the vault would be between him and the shots and while there, Keeton came out by him and the witness says that Keeton was putting his pistol in the scabbard and that as he put the pistol in the scabbard, Keeton remarked, "I have killed that damned old Thomas;" that the appellant then passed out into the hall and the witness followed him and asked how it happened, but appellant made no reply. The witness further says he then returned to his office and looked into the county attorney's office where the deceased was, but did not go into the office; that he saw the deceased sitting in a chair and that this chair was between the table and the south wall of the county attorney's offices and was near the west end of the table and was east of the door that connected the two offices of the county attorney and was rather behind the door as it swings on its hinges; that the deceased was sitting with his face towards the north wall of the room, his head was laid back on the chair, and there was not more than a foot or foot and a half distance between the wall and the chair and his left hand was lying in his lap. The witness further states: "I just opened the door and looked in and saw his position. Then I closed the door and went back." Mr. Kerr, another witness, testified that after the shots were fired he went into the county attorney's office and saw Thomas sitting in a chair; that it was a big office chair with square arms; that there was a door between the two offices of the county attorney which swings back toward the side he was sitting in; that Thomas was near the southwest corner of the table that was sitting in that room; that he was facing a little west of north and had one leg across the southwest corner of the table; that the table was higher than the seat of the chair; that his left leg was on the floor, his hat was lying over on the table and his head was hanging over the back of the chair. The witness further stated that the deceased was not quite dead when he went in; that he gasped several times; that the deceased had a 45-Colt's pistol which was in its scabbard and hung on his person about his hip pocket; that the deceased had on a coat and vest, the vest was buttoned up and the pistol was under his coat. The witness further stated that after he had gotten into the room the deceased gasped and that his foot fell off of the table. J. E. Hughes, the sheriff, tes-

tified that he went into the county attorney's office that morning to
see about some business and that when he got into the county's at-
torney's office he found Mr. Underwood engaged in a conversation with
some one and that he stepped into the north office to wait for him.
He proceeds as follows: "When I got into the north office I saw Mr.
Jackson standing there about the table and I saw Mr. Thomas after
I got far enough into the office, sitting rather behind the door and
about the table. I entered the county attorney's office from the south
door of the south room, passed north through the south room and
through the door between the two rooms into the north room, and Mr.
Thomas and Mr. Jackson were both on my right. When I got into
the room and saw Mr. Thomas I said, 'Good morning, Mr. Thomas,'
and he said, 'Good morning,' and I said, 'When did you get back?'
and he said, 'Saturday night,' and I said, 'Where's my man Banister?'
and he said, 'The Arkansas man got him,' and I said, 'You gave me
a dirty deal on that,' and he said, 'The Arkansas man did it.' When I
said to Mr. Thomas, 'You gave me a dirty deal,' he just kinder pulled
himself up in his chair and said, 'The Arkansas man did it.' When
Mr. Thomas said that, Mr. Keeton said, 'Don't tell a damn lie about
it, you got him yourself.' And Mr. Thomas pulled himself further
up in the chair and sorter threw his hand up, and I then saw Keeton
put his hand up as if for his gun, and I turned and ran out of the
room. When Mr. Thomas started to pull himself up in the chair his
hands were behind the table from me and I could not see them very
well. As he pulled himself up in the chair he pulled his hands up
like he was going under his clothes, then I looked at Keeton and saw
him putting his hand under his clothes, and when I saw that I thought
it was time for me to move. When I saw Mr. Thomas pull himself
up in his chair and move his hands as if going under his coat, Keeton
remarked, 'Don't tell a damn lie about it,' and I then looked at Keeton
and saw him make a move as if going under his coat and I got away
from there. . . . I left the room because I thought there was
danger. . . . I had heard of the threats that Mr. Thomas had been
making against me and Keeton, and I didn't know but what he might
shoot me. I think that I was in the door between the north and south
offices of the county attorney, or was just passing through it, when
the shot fired. . . . I went right to my office. I then came
back out in the passway of the hall east of my office. I didn't come
back into the county attorney's office where Mr. Thomas was at all;
I didn't see the body." The witness further testified that he did
not know that Thomas was in the county attorney's office when he
went in. The witness also stated, the last he saw of Keeton before
the shot was fired he was standing about the east end of the table and
four or five feet from Thomas and says: "Thomas was still in the
chair when I went out of the room; I was three or four feet from

the door when I started out; when the shot fired I think I was just about turned into the door. Don't think I had passed the door when the gun fired. . . . I might have said before the grand jury that I stated just after the gun fired, 'Keeton has killed Thomas.'" The witness continuing said: "The reason I said when I got into the outside room of the county attorney's office that Keeton had killed Thomas was that before I left the room they were in, I saw that Keeton had the advantage of Thomas and believed that Keeton was ahead in getting his pistol out." Appellant took the stand and said that he had gone up into the county attorney's office to see about some business that morning; that when he walked into this office no one was in there besides Jackson and Thomas, and continuing, appellant says: "Mr. Thomas was sitting over at the south side of the table and Mr. Jackson was at the northwest corner of the table. And a very short time after I stepped at the east end of the table Mr. Hughes came into the north room of the county attorney through the door that opens into the south room. Nothing had been said between Mr. Thomas and myself at that time except formal salutations. When Mr. Hughes came in he spoke to Mr. Thomas and then said, 'When did you get back?' and Mr. Thomas said, 'Saturday night,' and Mr. Hughes said, 'What did you do with our man?' and Mr. Thomas said, 'The Arkansas sheriff got him' or 'the Arkansas deputy got him,' I would not be positive. And then Mr. Hughes said, 'You gave us a double deal' or 'a dirty deal,' and when Mr. Hughes said that Mr. Thomas put his hands upon the chair and pushed himself up in the chair and started under his coat for his gun, and I said, 'Don't tell a dirty lie' or 'a damn lie,' and I went after my gun. I went after my gun because I saw Mr. Thomas going after his. . . . When I saw Mr. Thomas start for his gun I got mine and shot just as quickly as I could. . . . Mr. Thomas' position was just about like this: Slightly raising himself with his right hand under the right side of his coat and when I saw the handle of his gun I fired." The witness says he did not fire again because he saw it was not necessary and: "I saw I had hit him and I backed out of the room at the same door I came in." We have not undertaken to detail the feelings that existed between these parties before this difficulty. It had been going on for some little time, the sheriff's department trying to have Thomas removed from Amarillo and bad blood existed between the parties.

1. When the case was called for trial in Wilbarger County appellant made his application for continuance for the want of the testimony of one Will A. Norther, who, the appellant claimed, resided in Potter County, and one Arthur Ford, who, appellant claimed, resided in Hale County, by whom he expected to prove various threats that they had heard deceased make against the life of appellant. The qualification of the judge to the bill of exceptions to the overruling of the appli-

cation for continuance, states that there was a want of diligence on the part of appellant to secure the attendance of these witnesses; that no process had issued for the witnesses; that the motion for a continuance does not disclose when appellant first learned said witnesses were not in attendance upon court; that it does not show that he ever applied for process for the witnesses, nor does the record show any process had been requested. On the day that the case was set for trial which was the 20th day of September, 1909, the appellant procured an attachment for the witness Will Norther directed to the sheriff of Potter County. This attachment was returned not executed by the constable on the ground that Will Norther had left the State. As to the witness Arthur Ford, who was claimed to have resided in Hale County, the appellant caused a subpoena to issue to Hale County dated August 24th. This process was returned to the court on September 10th, ten days before the trial, with the return of the officer that the witness could not be found in Hale County, and there is nothing in the record disclosing any further diligence on the part of the appellant to secure the attendance of this witness. We are of opinion that the application is wanting in diligence and that the court correctly overruled same.

2. The second bill of exceptions is to the action of the court in permitting the State to ask the witness Barnes about certain statements that were made to him by appellant in reference to whether the appellant told the witness that he had been to the courthouse on the morning of the killing previous to the time he went when the killing took place, the contention being made that the appellant was in custody at the time, and therefore was inadmissible. The qualification of the judge to the bill is that this conversation occurred with the appellant some five or six days after the killing; that the killing occurred on Monday and on the following Thursday appellant was released on bond and that this conversation occurred after his release. This conversation occurred at the jail and out in the corridor where witnesses and everybody went into the jail. Appellant was the jailer of Potter County and the keeper of the jail at that time and it may be here stated there is nothing in the record or testimony that would indicate that appellant was ever in custody; he was never confined in jail and if it be conceded, as contended for by appellant, that before the confession of a defendant is admissible it must affirmatively appear that he was not under arrest, we think this record discloses affirmatively that he was not under arrest at the time the statement was made. The court did not err in admitting this testimony.

3. The fourth bill of exceptions is, we think, without merit. When Miller, a witness for the appellant, was on the stand on cross-examination he was asked the question if he had not been indicted for failure as an officer to suppress the whore houses and gambling houses in

Amarillo. The objection made being that the indictment itself would be the best evidence of what was charged and because said evidence was irrelevant and immaterial. The witness answered that he did not know what the indictment contained and that he paid very little attention to it. This answer of the witness was equivalent to not answering the question at all and in the shape the bill of exceptions is, before this court, we will not consider it.

4. Bill of exceptions No. 6 is to the action of the court in permitting the State's counsel to ask the witness Buckingham when he was on the stand if he, witness, did not state shortly after the gun fired, "That means something," and, "Keeton has killed Thomas." This question was objected to and the court in his explanation to the bill said that before he could rule on this question, the witness answered: "No, sir," and that ended the controversy. As to the second question asked this witness to which the appellant objected which was: "Is it not a fact that after you phoned Keeton that morning and told him that Thomas was over at the courthouse, didn't Keeton immediately come over to the courthouse?" and the witness answered: "I never saw him until after the shot was fired," the court says there was no objection made to same and refused to approve the bill as to this question. Independent of the qualification of the judge to the bill we would state that we think this was a legitimate question and the State had a right to ask it.

5. Appellant's bill of exceptions No. 7 is to the remarks of the court in ruling upon some testimony. It seems that when the witness Buckingham was upon the stand he was asked the question by the State, on cross-examination: "I will ask you if you ever sent any telegram to which you signed Mr. Hughes' name and with reference to Mr. Thomas being recalled from Amarillo?" This was objected to by the appellant and the court in admitting the testimony, appellant contends, used the following language: "Ordinarily I think that is true, but I am inclined to let in this testimony, the killing tends to implicate them both." The court in qualifying the bill states that he does not recall using any such language, but he says, the stenographic report makes him use this language and he appends to his qualification the stenographic report in connection with the remark and as to what transpired, and says that if he had used such language as that he did not intend to do so and that no attention was paid to it at the time, no opportunity was afforded the court by objections made to the remark to explain, or to withdraw it, or to correct it in any way; and that no objections whatever were made to the remark at the time made and the first time the matter was brought to the attention of the court was after the trial when the bill of exceptions was presented; and the judge refuses to approve the bill as to that objection to his remarks. We think with the qualification, as stated, by the

judge, this bill can not be considered. It seems the appellant accepted this bill as signed by the judge with the qualification and having accepted the bill with this qualification the appellant is bound thereby.

6. Bill of exceptions No. 9 is to the action of the court in allowing the State on cross-examination of appellant's witness Hughes to ask him if he did not, soon after he ran out of the room, make the remark, "Keeton has killed Thomas." Counsel for appellant objected to this question on the ground that it was hearsay, not binding on the appellant, irrelevant and immaterial, and prejudicial to his rights. The court states in his qualification to this bill that Jackson and Underwood had both testified, without objection, that as Hughes ran out of the back room of the county attorney's office just as the pistol fired and just immediately after it fired, Hughes exclaimed, "Keeton has killed Thomas;" that appellant's counsel asked the witness Hughes the following question: "When did you learn that Mr. Thomas had been shot?" that the witness answered: "Mr. Keeton came out of there and told me that he wanted to give up, and handed me his gun." That the appellant then introduced the statement of Hughes which was made before the grand jury stating his reasons for it, saying Keeton had killed Thomas at that time. This testimony we think was admissible upon two grounds: First, it was a contradiction of the impression that Hughes was trying to leave that he did not know of the killing until Keeton came out and gave him the gun; second, it was admissible as res gestae and part of the transaction. It was said simultaneously with the shooting or so close to it as to make it part of the transaction itself. The court properly overruled the exception.

7. Bill of exceptions No. 11 is to the action of the court in permitting the State, over the objection of appellant, to ask Hughes the question as follows: "Tell this jury about how many different times you have been indicted by the grand jury of Potter County?" The defendant objected to this question because it was irrelevant, immaterial and improper. The witness answered as follows: "Every time that Mr. Bishop could get a grand jury in the notion to do it. He ran that business. I think I was indicted for official misconduct. I don't remember that I was indicted for failure to execute process. I was indicted about every time that Mr. Bishop could get a grand jury that would do it. I was also indicted for appointing more deputies than they claimed I was entitled to. I may have been indicted for the misappropriation of public money." The objection that was made, the court states, in his qualification, was that the indictments were the best evidence. We think that the witness' answer that he had been indicted for official misconduct and for misappropriation of public money were both acts which would involve moral turpitude and were clearly admissible. The court says these questions were asked and answered without objection, except the objection that the bills of in-

dictment were the best evidence. We think this exception was without merit.

8. The 13th bill of exceptions relates to the action of the court in permitting the district attorney to ask the appellant when he was on the witness stand if he had not been indicted for an assault and battery committed in the sheriff's office on a man who was not supporting Hughes for sheriff. In the explanation to this bill the court states that in the direct examination of Keeton by his counsel he had gone on and detailed several different cases in which he had been indicted, including assaults and things of that sort, and stated these were all the cases in which he had been indicted when the district attorney asked if he had not omitted to tell about this assault in the sheriff's office. Counsel objected on the ground that this did not involve moral turpitude and therefore was objectionable. The court says that these assaults, or that is, three or four different assaults for which the appellant had been indicted had been brought out by the appellant himself and this was a cross-examination into the matter brought out by the defendant. With this qualification of the court the bill is without merit.

9. We have omitted considering three or four bills of exceptions as they are wholly without merit and no useful purpose could be served in perpetuating same in the opinion of the court. The court, in his charge to the jury, submitted the case on murder in the first and second degrees, self-defense and on provoking the difficulty. Several special charges were requested by the appellant. We are of opinion, however, that all the questions presented in these special charges were covered by the main charge of the court. It is, however, claimed that the court was in error in the charge that he gave on provoking the difficulty in paragraph 24 thereof, and that the court erred in not giving appellant's special charge No. 4 on provoking the difficulty. The 21st, 22d, 23d, 24th, 25th, 26th, 27th and 28th grounds of the motion for new trial complaining of the charge of the court, can not be considered because they are too general in their statement. All of these simply state that the court erred in giving in charge to the jury paragraph so and so, of his charge for the reason that said portion of said charge is not a correct enunciation of the law on the question sought to be submitted. This is the stereotyped objection urged against the charge of the court. An exception generally to the charge of the court is insufficient. An exception to the charge to be entitled to notice on appeal must point out the objection. It must state wherein the charge is erroneous. General exceptions are entitled to no consideration and will not be regarded on appeal. Thompson v. State, 32 Texas Crim. Rep., 265; Maxwell v. State, 31 Texas Crim. Rep., 119; Gonzalez v. State, 30 Texas Crim. Rep., 203; Quintana v. State,

29 Texas Crim. App., 401; Williams v. State, 22 Texas Crim. App., 497.

10. The 29th ground of the motion for new trial complains of paragraph 24 of the charge of the court on the ground that the same is not a correct enunciation of the law; that same places the burden on the appellant to prove his innocence; that it limits the right of defendant's acts to that of necessity; that it requires the defendant to prove that he was guilty of no wrong before he could be acquitted; that it requires the defendant to prove that he was in no way to blame before the jury could acquit him; that it requires the defendant to prove that he did not intend to provoke a difficulty instead of requiring the State to prove that he did intend to provoke a difficulty; and that it requires the jury to convict of murder either in the first or second degree if defendant's act caused the difficulty intentionally without reference to the nature or kind of difficulty the defendant intended to provoke. We are of opinion that all of the above objections to the charge except the last are without merit and that the charge does not throw the burden upon the defendant to prove his innocence. The last objection, which is that the court was in error in not submitting to the jury that if the defendant provoked the difficulty with an intention only to inflict an ordinary battery, then he would not be guilty of murder if he killed. In the light of the testimony in the case, we are of opinion that if provoking the difficulty is in the case at all there can be but one conclusion and that is, that the difficulty was provoked with the intention to kill, and that the circumstances surrounding the killing intimate that there had been no other purpose on the part of appellant than that of killing. The deceased was sitting down in a chair behind a table, the appellant was within five feet of him, the appellant accused him with telling a dirty or damn lie; the deceased made some slight motion of his body in the chair; the appellant fired and this shot was fired before a man could make six steps, almost instantly. It shows that all necessary preparations had been made by the appellant; that he had gone into this room where the deceased was, and while he says his purposes were innocent and that he did not know the deceased was in there, yet, the rapidity of his movements, the quickness with which the remark made by him was followed by the firing of his pistol, all indicate that if he made the remark that his purpose in making it was to provoke a difficulty. It could not have been with a lesser intention than that to kill, and for the court to have submitted a lesser offense would have been a drawing upon the imagination and submitting an issue not warranted or justified by the facts. The charge of the court on this issue was as follows: "A perfect right of self-defense can only obtain and avail where the party pleading it acted from necessity and was not guilty of a wrong, or was not to blame, and which conduct on his part was

not intended for the purpose of, or reasonably calculated to produce the necessity which required the action on his part. If, however, he was in the wrong, or was in the act of violating the law and, on account of his own wrong, with the intent on his part to bring on a difficulty and was thereby placed in a situation wherein it became necessary for him to defend himself against an attack or apparent attack made upon himself, which was superinduced or created by his own wrong, then the law justly limits his right of self-defense and regulates it according to the magnitude of his own wrong. Now, if you shall find and believe from the evidence beyond a reasonable doubt that the defendant sought the deceased, or went to where the deceasd was at the time and place of the killing, armed with a deadly weapon, and by acts or words, used or made with the intent and purpose of provoking a difficulty with the deceased, and went with the intent of killing him, or inflicting upon him serious bodily harm, and that such acts or words, if any, were reasonably calculated to provoke the deceased to make an attack on the defendant, and if the same was so used or made with such intent; and, if you find that under such provocation the deceased attacked the defendant, or made a demonstration which reasonably indicated to defendant, viewing it from his standpoint at the time, that he was then in danger of death or serious bodily injury at the hands of the deceased, then, in case you so find, the defendant could not justify on the ground of self-defense; and if he shot and killed the deceased under such circumstances he would be guilty of murder either in the first or second degree, as you may find the facts warrant you in finding under the definitions of murder heretofore given you in this charge." We do not think that this charge throws the burden upon the defendant. In the general statement at the beginning of paragraph 24 it may be that said portion of the charge is not abstractly correct, yet, when the court attempts to make an application of the principles of law governing the provoking of a difficulty, he states to the jury that they must believe beyond a reasonable doubt that the defendant shot the deceased or went where the deceased was; that he went there armed and with an intent and purpose of provoking a difficulty with the deceased and with the intent to kill him or inflict upon him serious bodily harm and did by acts or words provoke the deceased to make an attack upon him and that these acts and words were reasonably calculated to do so and that if the same were made with the intent to bring on a difficulty and with the intent to kill, then the defendant could not justify on the ground of self-defense and he would then be guilty of murder. We hold, therefore, that this charge is not subject to the criticism of appellant in that it throws the burden upon the defendant. We hold further that if provoking the difficulty was in the case, there was no issue in the case other than a purpose to kill or inflict serious bodily injury.

The appellant requested the following special charge: "Even though you may find and believe from the evidence that the defendant Keeton immediately before the fatal shot was fired used language to the deceased that was reasonably calculated to provoke the deceased to a difficulty, and you further .believe that said language did have the effect of provoking the deceased to attack the defendant or make a demonstration as if to attack him, if you further believe the deceased was in the act of attacking the defendant with a deadly weapon or was making any demonstration which was reasonably calculated to and did produce in the mind of the defendant the belief that the deceased was about to take his life or inflict serious bodily injury upon him, and that the defendant shot and killed the deceased under these circumstances, you will acquit the defendant and say by your verdict "not guilty," unless you are further satisfied from the evidence introduced on the trial that the defendant in using the language he did use immediately preceding the shooting, did so for the purpose of and with the intent at the very time he used it, of provoking the deceased to attack him, and with the further purpose and intent at the very time he used the language of slaying the deceased in the event the deceased should attempt to attack the defendant as the result of said language." We think, in the first place, that this charge is not correct. It states that though the defendant, Keeton, before the fatal shot was fired used language to the deceased that was reasonably calculated to provoke the deceased to a difficulty and though the jury believe that such language had the effect of provoking the difficulty, and that after the deceased made a demonstration as if to attack him with a deadly weapon; or if he made a demonstration which was reasonably calculated to and did produce in the mind of defendant the belief that he was going to attack him and the defendant shot and killed the deceased, under these circumstances they would acquit the defendant. This we do not think is a correct enunciation of the law, in that it excludes from the consideration by the jury the purpose and intent of the defendant in using language that was calculated to provoke a difficulty. While it is true this court has held and correctly held that the language used or the acts done must not only be reasonably calculated to provoke the difficulty, yet, before the right of self-defense would be abridged the words must have been spoken or the acts done with intent on the part of the defendant at the time the words were`spoken to provoke the difficulty. It is true that the latter part of the charge says that they would acquit unless the jury were satisfied from the evidence that the defendant in using the language did so for the purpose and with the intent at the very time of using it of provoking the deceased into a difficulty. This had been correctly stated in the main charge. The court had told the jury that they had to believe beyond a reasonable doubt that it was done with

the intent to provoke the difficulty and we think so far as the law of the case is concerned the same had been presented in the main charge and that there was no error in refusing this charge or that there was such error as was prejudicial to the appellant. See Gaines v. State, decided at this term of the court. Sanders v. State, 50 Texas Crim. Rep., 430; Airhart v. State, 51 S. W. R., 214; McCandless v. State, 57 S. W. Rep., 672; Shannon v. State, 35 Texas Crim. App., 2; Beard v. State, 47 Texas Crim. Rep., 50; Bonner v. State, 29 Texas Crim. App., 223; Drake v. State, 46 Texas Crim. Rep., 448; Stewart v. State, 36 Texas Crim. Rep., 130, and Craiger v. State, 48 Texas Crim. Rep., 500. As has been stated frequently by this court, in determining the sufficiency of a charge it must be construed as a whole and not by isolated extracts, excerpts or paragraphs. It must be treated as an entirety and regard must be had as to the connection and interdependence of its parts. See Hooper v. State, 29 Texas Crim. App., 614; Neel v. State, 33 Texas Crim. Rep., 408. It is unjust and unfair to the trial court that expressions, words or excerpts of the charge should be torn from the context and an attempt made to give it a construction not in keeping with the main charge. We think when the whole charge is examined it was a most admirable presentation of the law of the case; that there were no errors in it of sufficient importance to authorize a reversal.

Finding no error in the record the judgment is in all things affirmed.

*Affirmed.*

ON REHEARING.

May 18, 1910.

McCORD, JUDGE.—On a former day of this term of the court the judgment herein was in all things affirmed. Appellant has filed a motion for rehearing and insists that this court was in error in affirming the judgment because of the numerous errors committed in the trial court, and that this court was in error in holding that manslaughter was not in the case, and also in holding that the charge of the court on provoking a difficulty was not erroneous. Appellant also insists that this court was in error in holding that the grounds of the motion for a new trial upon the charge of the court, were too general to be considered, it being insisted that to object to a paragraph of the charge of the court on the ground that it did not charge the law was sufficiently specific to call the attention of the court to the error. We are not disposed to break away from the line of authorities, which seem to be uniform in this court, in holding that objections to the charge of the court will not be considered unless the particular point or error is set out in the motion for new trial, and that simply to say that the court below erred in paragraph one of its

charge because the same was not the law, is too general. It must point out how or in what manner the charge was erroneous.

It is also insisted that this court .was in error in holding that the trial court did not commit error in the admission and rejection of testimony as shown by appellant's bill of exception. We have reviewed carefully all the bills of exception in the record, and we adhere to our former holding, that the court below did not commit prejudicial error in the admission and rejection of testimony.

It is contended that the preliminary statement of the court in his charge to the jury in regard to provoking the difficulty, was erroneous, and that such error was prejudicial to the defendant. This portion of the charge is paragraph 24, set out in the original opinion. It may be conceded that this paragraph of the court's charge was erroneous, but when it is followed with an application of the principles of law governing the provoking of a difficulty, to the facts of the case, it will be seen that the charge is not subject to the criticisms of appellant. The court may have, in the preliminary statement of the definition of an offense, committed error, but when the court came to apply the law to the facts of the case, if then he stated the matter correctly, the charge would be relieved of serious criticism. In the case of Railsback v. State, 53 Texas Crim. Rep., 542, appellant was indicted for assault with intent to rape. When the court came on to define rape, he defined rape by force, threats and fraud, and also on a woman who is mentally diseased, and the carnal knowledge of a female under the age of 15 years, and this court held: "That this portion of the charge was erroneous and not called for by the facts of the case, under the indictment here presented, is, we think, evident. The indictment alleged assault by force, threats and fraud by appellant upon the person of Maud Harding. The proof in the case excluded any question of fraud and was mainly an assault to rape, if a crime at all, by force. Notwithstanding the inclusion of some matters in the definition of rape, having no relation to the charge made in the indictment or the evidence adduced when the court came to apply the law to the facts, the charge is, we believe, subject to no serious criticism." We, therefore, hold that while this preliminary statement may have been erroneous, yet when the court applied the law to the facts he presented all the legal elements of provoking a difficulty, and the preliminary statement could not have been injurious to the rights of the defendant.

Again, complaint is made of this charge because the court told the jury that if appellant provoked the difficulty with the intention to inflict death or serious bodily injury, he would be guilty either of murder in the first or second degree, the contention of appellant being that if appellant provoked the difficulty to inflict an injury less

than death, then it would be only manslaughter, and that the court was in error in telling the jury that if he provoked the difficulty with intent to inflict serious bodily injury it would be murder. We have found no authority that upholds appellant's contention in this respect. Article 708 of White's Penal Code reads as follows: "Though a homicide may take place under circumstances showing no deliberation, yet if the person guilty thereof provoked a contest with the apparent intention of killing or doing serious bodily injury to the deceased, the offense does not come within the definition of manslaughter." Therefore, if the slayer provoked the contest with the deceased with the apparent intention of killing him or doing him some serious bodily injury, he is guilty of murder, although he may have done the act of killing suddenly, without deliberation and in order to save his own life. The law allows no justification in such a case, and no reduction of the grade of homicide below that of murder. If, however, he provoked the contest without any intention to kill or inflict serious bodily injury, and suddenly without deliberation did the act of killing, while the act would not be justifiable homicide, still it might be a lower grade of homicide than murder. See Green v. State, 12 Texas Crim. App., 445; Reed v. State, 11 Texas Crim. App., 509; King v. State, 13 Texas Crim. App., 277; Cartwright v. State, 14 Texas Crim. App., 486; Smith v. State, 15 Texas Crim. App., 338; Meuly v. State, 26 Texas Crim. App., 274; Polk v. State, 30 Texas Crim. App., 657; Jackson v. State, 30 Texas Crim. App., 664.

We do not believe that an authority can be found that holds that because appellant might have provoked the difficulty with intent to inflict serious bodily injury, that that would reduce the killing below the grade of murder. Do the facts in this case call for a charge on provoking the difficulty with an intent less than murder or of inflicting serious bodily injury? We answer, no. There is not a circumstance; there is not a word that would indicate that if appellant provoked the difficulty it was for any other purpose than to inflict death or serious bodily injury. For the court to have submitted an issue not raised by the testimony, would have been bringing into the case issues not authorized.

Therefore, believing that the original opinion is correct, and that there is no merit in appellant's contentions, the motion for rehearing is overruled.

*Overruled.*